W. E. BERGMAN, Appellee, v. WAPELLO COAL COMPANY et al., Appellees; J. E. MARTIN, Appellant.

CONSPIRACY: Evidence—Sufficiency. Record reviewed, and held insufficient to establish an alleged conspiracy to defraud plaintiff of his interest in property.

FRAUD: Waiver—Waiver by Action for Breach of Contract. He who
2    bases his action on the breach of a contract thereby affirms the
contract, and may not recover damages for fraud in the inception
of the contract.

APPEAL AND ERROR: Cross-Appeal—Duplication of Appellant's
3    Abstract Unnecessary. A cross-appellant need not duplicate appellant's abstract. An amendment to appellant's abstract, accompanied by a certificate by counsel to the effect that appellant's abstract and the cross-appellant's amendment contain all the record, is all-sufficient.

Headnote 1:   12 C. J. p. 639.   Headnote 2:   27 C. J. p. 18 (Anno.)
Headnote 3:   4 C. J. p. 387 (Anno.)

*Appeal from Wapello District Court.*—C. W. VERMILION, Judge.

MAY 12, 1925.

REHEARING DENIED SEPTEMBER 25, 1925.

ACTION to recover damages for breach of contract involving the leasing and developing of certain coal lands. From a judgment in favor of the plaintiff, the defendant Martin appeals; and the plaintiff, Bergman, cross-appeals as to certain matters involved in the case with reference to which the court held against him.—*Affirmed on both appeals.*

*Gillies & Daugherty* and *Roberts & Webber,* for appellant.

*J. L. Chapman,* for receiver.

*Gillies & Daugherty,* for Wapello Coal Co. and G. Lewis Woodford & Co.

*W. W. Bulman* and *Oscar A. Stafford,* for plaintiff, appellee.

ALBERT, J.—The abstract of record in this case, together with the amendments thereto, covers approximately six hundred pages, and the facts involved are so extensive that no comfort to the litigant or aid to the legal profession will

1. CONSPIRACY:
evidence: sufficiency.

be gained by an exhaustive recitation of the facts herein. The pleadings involved are equally

extensive and complicated. Owing to the fact that there are but two errors assigned on the part of the appellant Martin, we will not attempt to set out the issues as made by the pleadings. We will do no more than set out such of the conceded facts or the facts which are properly proved in the case, to the end that the conclusions reached herein may be fairly understood.

The trial court entered judgment against the Wapello Coal Company and E. C. Loomis, receiver therefor, and G. Lewis Woodford & Company in certain amounts. They have not appealed herein, which leaves the only matters in controversy those between Bergman and Martin.

It appears that, in 1916, the plaintiff, Bergman, was a resident of Wapello County, Iowa, and the owner of certain coal lands or leases in that county. The evidence shows that he was, to a large extent, a soldier of fortune, and a speculator, with a very little capital behind him. He was in Minneapolis during that year, and became acquainted with the defendant J. E. Martin, who appears to have been a man of means. Bergman, at that time, was representing to Martin the wonderful opportunities for making money in the coal business in Iowa, and on the strength of these representations, Martin commenced to loan money in various amounts to Bergman. In 1917, Martin awakened to the fact that he had loaned Bergman something like $12,000, and, as he expresses it, ''there was not a scratch of the pen to show for it.'' He took the matter up with Bergman, and on December 29, 1917, this matter was adjusted between them by Bergman's transferring to Martin a half interest in the certain coal lands and leases then controlled by Bergman in Wapello County, Iowa; but, as usual, Bergman was hard pressed for finances, and, as a part of the settlement between them, Martin agreed to advance enough to make $15,000, but in fact advanced enough to make a total amount of about $18,000.

Bergman had control of two different tracts of coal land in Wapello County: one designated in the record as the Nelson tract, and the other known as the Bidwell tract,—the latter containing something over 1,000 acres. The Nelson tract owned by Bergman had been previously contracted to the Woodford Com-

pany, on certain conditions not now material herein, and they had organized a company to develop the same, which was known as the Quality Coal Company. Said company was organized and incorporated under the laws of the state of South Dakota.

After the adjustment between Martin and Bergman, the question arose as to the development of the coal land. Martin, who was inexperienced in coal matters, commenced to chafe, because he was unable to see where he was to realize on his interest thus acquired from Bergman. Taxes, interest, and royalties were becoming due, and there was no income from the property to pay the same. In order that the property might be developed, after several conferences between Martin and Bergman, in which various plans of financing and developing were considered, Bergman being unable to solve the problem, Martin took up the matter with the Woodford Company. After numerous negotiations, Martin initiated a conference in Chicago between Bergman and the Woodford Company, which resulted in the making of a contract, on the 23d of April, 1919, by the terms of which Bergman leased to the Woodford Company the aforesaid Bidwell tract for a term of 20 years, they to pay Bergman 20 cents a ton for all coal mined from this land, and also to pay Bergman $5,000, on the execution of the agreement, $5,000 on July 25, 1919, $15,000 on October 10, 1919, and $25,000 on December 1, 1919. It is around this provision as to these payments that the principal part of the controversy centers. There are many other provisions in the contract, which, if material, will be referred to later, the contract being too lengthy to set out in this opinion.

Martin, by a writing attached to said contract made by Bergman and Woodford Company, consented to the making, execution, and delivery of the contract and agreement, and consented and agreed to be bound by the terms thereof in all respects as though he were a third party thereto. It appears that, in his efforts to protect his interest and realize something out of his investments with Bergman, Martin was quite anxious that the aforesaid contract between Bergman and the Woodford Company should be made. In order to induce the Woodford Company to enter into the contract, he agreed with them to ad-

vance to them the sum of $10,000 for the first two payments un-
der the contract aforesaid between Bergman and the Woodford
Company. Just what this agreement was, is quite material in
this case; and, as the same was in written memoranda, signed
by the parties, we abstract and quote from said agreement the
following:

"That, whereas, the Woodford Company is about to enter
into a contract with Bergman with reference to the Bidwell
coal lands, and whereas, the lease provides, among other things,
that the Woodford Company is to pay Bergman the sum of
$5,000 on execution of the Bergman-Woodford Company con-
tract, and an additional sum of $5,000 on the 25th of July, 1919,
and, whereas, Martin is willing to make payments for and in
behalf of the Woodford Company, under the terms and condi-
tions hereinafter set forth, the parties do hereto agree as fol-
lows: * * * Martin agrees that he will make the payment to be
made to said W. E. Bergman, of $5,000 upon the execution of
said lease, and the sum of $5,000 on July 25th, 1919."

At this time, Martin, in writing, made the following propo-
sition to Bergman, in the following words:

"In consideration of the endorsing to me of the checks for
the first $10,000 advanced royalties to be paid by the lessee un-
der the coal lease from W. E. Bergman to G. Lewis Woodford
& Company, I agree to hold the same in trust for both of us
and will draw checks thereon to purchase drill and pay expenses
of drilling, * * * and will account for any balance of said sum
remaining after making such payments."

To make the matter clear, on the next day Martin wrote to
Bergman another letter, confirming the one of the day before,
in which he suggests that the agreement with reference to the
handling of the $10,000 advanced as royalties be as follows:

"I agree to hold the same in trust for both of us and will
draw checks thereon for the purpose of keeping the present
leases alive, and to purchase drill and pay the expenses of
drilling."

In pursuance of these writings, when the lease was signed
in Chicago with the Woodford Company, Martin advanced to
the Woodford Company $5,000, and the Woodford Company

executed their check to Bergman for $5,000, which was indorsed by Bergman and turned back to Martin. This $5,000 payment was expended by Martin in accordance with his agreement with Bergman, was duly accounted for, and is not in controversy herein. Bergman's claim, however, is that the second $5,000 payment is due him from Martin, and, among other things in the case, he asks to recover therefor; and this is one of the controverted points herein. The court below found that there had been certain payments made by Martin which were chargeable against this $5,000, and that, as Martin was equal owner with Bergman, under the terms of the lease, he would be entitled to one half of the $5,000, after the deductions and credits made by him for the amounts properly expended by him; and the court calculated the amount due Bergman from Martin out of this $5,000 payment to be $1,858.60, plus interest, which amounted, at the time of the entry of the judgment, in all, to $2,174.55, which we find to be the correct mathematical calculation thereunder; and if the judgment of the lower court is sustained, the amount is approved by us.

It is the claim of Bergman that Martin and the Woodford Company entered into a conspiracy to defraud him of his interest in these coal lands. To the end that this contention may be understood, among other things the contract of April 23, 1919, between Bergman and the Woodford Company, provided that a corporation might be organized to develop this coal land, and that, in the event that such was done, the Woodford Company might sell, assign, or transfer to such corporation their contract with Bergman and all their rights thereunder; and, upon the acceptance thereof, in writing, by the corporation, to pay and discharge all the obligations of Woodford & Company, that such acceptance by the corporation should release Woodford & Company from all its obligations under the contract to Bergman, upon the written notice of said acceptance by the corporation.

In pursuance to the provisions of the contract, a corporation was organized, under the laws of the state of Iowa, and the Bergman-Woodford & Company contract was transferred to this corporation, which accepted the same, and agreed to carry

out the contract and to pay Bergman in accordance with the terms thereof. Bergman was duly notified thereof, as provided by the written contract between himself and the Woodford Company. As a consideration to Woodford & Company, the corporation contract was to pay them $200,000 for the transfer and sale to the corporation of their interest under the Bergman contract. Only a small amount of the stock of this new corporation, known as the Wapello Coal Company, was ever issued. There are numerous complications surrounding this company and its organization. Its capitalization and the amount to be paid by it to the Woodford Company all savor of high finance; but it is to be remembered that, at the time of the organization of this new corporation, inflation was at high tide in this country. It is the claim of Bergman that the Wapello Coal Company was never a solvent concern, and that it was organized as a part of a plan on the part of Martin and Woodford & Company to release Woodford & Company from all liability under their contract with Bergman, and that the corporation was, in fact, merely a dummy for that purpose. We are disposed to hold, however, under the evidence of the case, that Bergman has failed to sustain this contention. It looks to us as though these people, with the enlarged financial imagination that generally existed at that time, conceived that they had a proposition that would net them large amounts of money, and that they entered into the same in good faith, with the belief that they would realize their anticipations in the development of this coal field. Suffice it to say that, like many other projects that were attempted during those times, the break in the financial situation, or some other cause, wrecked the enterprise. Of course, whether or not Woodford & Company escaped liability to Bergman is of no interest now, because Woodford & Company are not appellants herein; and we are only interested in this matter because of the contention of Bergman that Woodford & Company and Martin conspired by these means to defraud him, and he asks for judgment for damages against Martin for thus participating in what he alleges to be a conspiracy against him. We dispose of this issue by holding that Bergman has not sustained the burden of proof on him in relation thereto, and therefore is not entitled to any damages by reason of such claim.

More than this, if there were anything in Bergman's contention that there was a conspiracy between Woodford & Company and Martin, we are fully in accord with the reasoning of

2. FRAUD: waiver: waiver by action for breach of contract.

the district judge in relation thereto, as set forth in the opinion filed by him, wherein, among other things, he makes the following finding:

"The first thing that challenges attention in this connection is the fact that Bergman has lost nothing that he had before the lease to Woodford & Company was made. He did not transfer to Woodford & Company the rights he held under his options or contracts with the landowners, but only granted the right to mine the coal under such lands, upon the payment of a royalty to him. The coal has not been mined, and all the royalty has not been paid, it is true; but the contract of lease contemplated such a contingency, and made apparently ample provision for the protection of Bergman in that event. At all events, it made such provision as he saw fit to insist upon, including the right of forfeiture. Indeed, in one count of the original petition, he alleged that he had forfeited the lease, and sought to have an adjudication so declaring. In a subsequent amendment he withdraws this claim, though the evidence shows he had previously served notice of his intention to claim a forfeiture. Be that as it may, however, the point is that he has not been deprived of anything or damaged by entering into the lease, no matter what the inducements were; but, if damaged at all, it is by the failure of the lessee to perform the contract. However, he is seeking to recover for a breach of the contract, and he cannot, I think, thereby affirm the contract, and at the same time recover for alleged fraud in its inception. In this connection, he claims it was fraudulently represented to him, or promised, that the corporation which Woodford & Company would organize to develop the property would be a 'closed corporation.' By that, I take it, he means a corporation with relatively few stockholders, and one whose stock is not offered for public subscription. If that was the agreement, he had ample opportunity to insist upon its being so provided in the lease. But I think he knew, or had most excellent reason to believe, that the corporation contemplated would offer its stock to the

public. All of his prior dealings with Woodford & Company, with respect to both the Bidwell and the Nelson tracts, had contemplated an operating company whose stock should be offered to the public generally. His claim that this transaction was to be upon a different basis is supported by his own testimony alone, and contradicted by all the other parties interested in the negotiations. The contract by which Martin agreed to advance the $10,000 to pay that amount of the advance royalty, upon which stress is laid, as tending to show the claimed conspiracy, was a contract by which Woodford & Company agreed to pay Martin for so doing, out of the proceeds of the sale of the lease, that it was certainly contemplated Woodford & Company should sell. That is to say, it was Woodford & Company's property Martin was to get,—not Bergman's. As said above, Woodford & Company was, to Bergman's full knowledge, engaged in merely promoting the enterprise,—not going into it with the intention of itself operating a mine. That Woodford & Company expected to profit by the promotion was perfectly plain. That it saw fit to secure money for its immediate needs by agreeing to turn over part of its prospective profits to Martin if he would provide it, would not constitute a fraud as against Bergman. I think Bergman knew at all times that this money which was to be paid him would be raised in some such way, and certainly knew, at a much earlier date than he is now willing to admit, that Martin was advancing it. The contract by which Woodford & Company transferred the lease to the Wapello Coal Company may have been fraudulent as against subscribers to the stock of the latter. But again, it is to be noted, it was the property of Woodford & Company,—not that of Bergman,—that was being disposed of; and it was out of that property that the exorbitant price complained of was to be paid. It is hardly reasonable to say that Woodford & Company made the lease with Bergman, organized the coal company, and transferred the lease to it, with the purpose of defrauding Bergman by rendering it impossible for the coal company to carry out the terms of the lease, when neither Woodford & Company nor the coal company could get anything of Bergman's except by complying with the lease. I am satisfied the truth of the matter is, they all expected to

profit at the expense of the subscribers to the stock of the coal company, and made their contracts accordingly: Bergman for $25,000 a year guaranteed royalty and $50,000 advanced royalty, to be paid him in a little over seven months; Woodford & Company for $200,000 (which it is claimed was to be in stock of the coal company), and an additional royalty to be paid by the coal company for the lease; and Martin, $90,000 in stock, and a part of the additional royalty to be paid by Woodford & Company for the $10,000 cash advanced by him. And of Martin, who owned a half interest in Bergman's contracts, can it be said that he was trying to defraud both Bergman and himself by means of the lease and the organization of a fraudulent corporation to take it over? But it is urged that he tried to obtain Bergman's interest in the contracts by inducing the landowners to forfeit the contracts, as against himself and Bergman, and to make new contracts with him alone. He claims he was only trying to protect his interests which were jeopardized by Bergman's inability to make his part of the payments required. Be that as it may, had he succeeded in this direction, it would only have resulted in making him, to a still greater extent, the victim of his machinations with Woodford & Company, if plaintiff's theory be accepted. But he did not, in fact, obtain Bergman's interest in any of the contracts. Martin and Woodford & Company, considered together, could only profit by making the Wapello Coal Company successful, at least to the extent of selling its stock; and then not at the expense of Bergman, whose only interest in the coal company was that of a lessor to it. Martin alone, if he wrecked the coal company, would hurt himself as much as Bergman; and if he succeeded in getting Bergman's interest in the contracts, injured himself alone. I repeat, the scheme—conspiracy, if it be so called—was aimed at the investing public; and all parties, Bergman included, looked to that source for their profit. But, to my mind, the uncontroverted answer to the charge of conspiracy and fraud is that Bergman has not lost anything except by the breach of his contract of lease; and neither Martin nor Woodford & Company has obtained anything of Bergman's, except that Martin bought a half interest in his options for $15,000, of which no

complaint is now made, and Woodford & Company secured the lease, which he is now seeking to enforce.''

As to this part of the case, therefore, the only thing left is the question of whether or not Bergman is entitled to recover against Martin on the second $5,000 payment hereinbefore referred to. To the understanding of this question, some further facts are necessary. In the Chicago contract between Bergman and Woodford & Company, Woodford & Company were to drill twelve holes on the Bidwell tract, to determine the availability of the said tract as a coal enterprise. Bergman seems not to have been satisfied with this provision of the contract, and subsequently made a contract, dated May 6, 1919, with Woodford & Company, according to the terms of which Bergman was to bore these test holes, and Woodford & Company were to pay 75 cents a foot therefor. Woodford's contract was that the boring of these twelve holes was to be completed by the first of July, 1919; but Bergman's contract with the Woodford Company extended the time for the completion of this drilling. Woodford & Company agreed to deposit in the bank in Wapello County the money to pay Bergman for this drilling; and under this contract it was further agreed that the second $5,000 payment from Woodford & Company to Bergman was not to be payable until after Bergman had completed the drilling of the twelve holes. Bergman proceeded with this work, and drilled his twelve holes; but three of them were not completed,—one of which was never paid for by Woodford & Company; and they failed to keep the money on deposit to meet the current demands of Bergman in doing this work; and, as usual, being short of funds, he was unable to complete three of said holes; and Martin contends that the second $5,000 was never due Bergman, because he did not so complete his work.

We are disposed to agree with the *nisi prius* court in holding that the conduct of Woodford & Company was a sufficient excuse for Bergman for not completing his work. The question, therefore, is whether or not, under the above facts, Bergman was entitled to require Martin to account for the second $5,000 payment. This involves the construction of the contract between Martin and Woodford & Company heretofore set out, and the

correspondence between Bergman and Martin in relation to the
$10,000 payments. In the construction of these matters, we are
enlightened somewhat by the testimony of Martin himself in
relation thereto. It appears from the evidence that Martin paid
the second $5,000 to Woodford & Company; they advising Mar-
tin that it was not to be paid to Bergman, because Bergman
had not completed the drilling.

We hold that, under the situation as developed by the
testimony, the second $5,000 payment, less the proper de-
ductions, was due to Bergman, under the contract from Mar-
tin, under the agreement that he had with Bergman and
Woodford & Company, and that the lower court was correct in
holding that Bergman was entitled to a judgment against Mar-
tin for Bergman's half of that amount; and the finding of the
lower court in respect thereto is approved.

It is contended on the part of Martin that the matters in-
volved herein were all adjudicated in one of the previous actions
between Bergman and Martin, growing out of some phases of
this identical transaction. It appears that there had been previ-
ously tried in the district court of Wapello County, an action
entitled "Bergman v. Martin," in which Bergman attempted
to hold Martin in this matter, as a partnership, or as a joint
adventure; and he sought and contended as to certain matters
on one of those theories. He failed in the action, and the court
held that the transaction was not a partnership or joint adven-
ture; but there were certain items involved in that matter on
which there was an accounting and a judgment entered by the
court. Practically all the exhibits and evidence used in the
case at bar were used in that case, for the purpose of determin-
ing whether it was a partnership or joint adventure; and it is
now claimed by Martin that this question of liability on the sec-
ond $5,000 advanced royalties was adjudicated therein; but a
careful review of the court's findings and the record in that case
satisfies us that this matter was not taken into consideration in
that accounting, and therefore was left at large, and subject
to an investigation in this case. We therefore conclude that
there was no adjudication of this matter in that case. A cross-
appeal by the defendant Bergman has already been practically
disposed of herein. We have further to say, in relation there-

to, that Bergman, in his cross-appeal, seeks to hold Martin for all of the first year's payments provided for in the contract between Bergman and Woodford & Company.  Since we have already disposed of the charge that Bergman makes, that Martin and Woodford & Company entered into conspiracy to defraud Bergman, there is little left in the issue, except the broad claim that Bergman makes against Martin for the total amount due for the first year's payment of advanced royalties, under the Bergman-Woodford & Company contract.  A careful reading of the record and the many exhibits in the case satisfies us that there is no merit in Bergman's claim thus made against Martin.

It is insisted by Bergman that the relation between Martin and the Woodford Company at and after the Chicago contract, was such that they should be said to be joint promoters, partners, or joint adventurers in what took place after that contract was made, especially in relation to the organization of the Wapello Coal Company; and that, this being true, Martin was equally liable to Bergman for the payment of all of the specified amounts provided for in the Chicago contract; that whatever was done in relation thereto was through the combined efforts of Martin and Woodford & Company, to the prejudice of Bergman.  Much that has heretofore been said in this opinion answers this proposition; and we are constrained to hold, under the evidence in this case, that Bergman's contention so made has no support in the evidence.  The evidence does show that relations between Bergman and Martin were strained, and that there was no co-operation between them.  Naturally, with this situation, if Martin was to realize anything out of his interest in this property, it must be through some source other than Bergman.  It is also quite apparent that, had the plan marked out been realized, it would have inured as much to the benefit of Bergman as it would to Martin.  As heretofore said, and as was demonstrated by the final outcome of this proposition, Martin has lost what he put in, and has realized nothing from his investment.  We therefore hold that Bergman has not sustained this contention so made by him.  Therefore, as to Bergman's appeal, the case is affirmed.

Equally so as to Martin's appeal, the case is affirmed.

One other matter remains for consideration.  It is the claim

of Martin that Bergman is in default on his cross-appeal herein, because Bergman did not file an abstract in this court. Martin

3. APPEAL AND
ERROR: cross-
appeal: dupli-
cation of appel-
lant's abstract
unnecessary.

moves to dismiss Bergman's appeal for that reason. While it is true that Bergman did not file an abstract for himself in the case on his cross-appeal, he did file an amendment to Martin's abstract, in which he certifies that Martin's abstract, together with Bergman's amendment, constituted a full, correct, and complete abstract of the record, covering all questions raised on appeal by both Martin and Bergman. We think this is sufficient compliance with the rules of the court, and therefore the motion to dismiss Bergman's appeal is overruled.—*Affirmed on both appeals.*

FAVILLE, C. J., and EVANS, STEVENS, ARTHUR, and DE GRAFF, JJ., concur.

VERMILION, J., took no part.